**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, *Petitioner*, | No. 16-71933 |
| v. | OPINION |
| DEBRA H. THOMAS, in her capacity as Acting Regional Administrator, United States Environmental Protection Agency, Region 8; U.S. ENVIRONMENTAL PROTECTION AGENCY, *Respondents*, | |
| MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY; TALEN MONTANA, LLC, *Respondents-Intervenors*. | |

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted February 14, 2018
San Francisco, California

Filed August 30, 2018

Before:  Mary M. Schroeder and Johnnie B. Rawlinson,
Circuit Judges, and William K. Sessions III,[*] District
Judge.

Opinion by Judge Rawlinson

## SUMMARY[**]

### Environmental Law

The panel denied a petition for review challenging an action of the United States Environmental Protection Agency approving a 1994 revision to Montana's State Implementation Plan.

Petitioner alleged that the EPA's approval was arbitrary and capricious because the Montana Department of Environmental Quality ("DEQ") interpreted "actual emissions" less stringently than the Clean Air Act would allow.  The DEQ's interpretation was advanced in unrelated litigation (the "*Talen* case").  Petitioner further alleged that Montana's 1994 Revised State Implementation plan was deficient, and the EPA should not have approved the 2008-2015 revisions until the state definition of "actual emissions" complied with federal standards.  Petitioner submitted a comment during the EPA's notice and comment period

---

[*] The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

following Montana's submission on December 17, 2015 of its final implementation plan.

The panel held that the language of the Implementation Plan concerning the "two year period" in determining a source's actual emissions was ambiguous where the DEQ and the EPA reasonably interpreted the phrase to mean two different things.   The panel further held that it was appropriate to give deference to the EPA's reasonable interpretation, consistent with the deference given under *Chevron* to the EPA's rulemaking authority.   The panel agreed with the EPA that petitioner's comment raised a question of implementation of a program rather than approval of a plan, and as such, DEQ's statements in the *Talen* case need not be resolved at the approval phase of the state plan.

The panel held that because the EPA's interpretation of ambiguous text in the 1994 Revised Implementation Plan was a permissible one, and because the EPA's interpretation controlled, its approval of the succeeding 2015 Implementation Plan was not arbitrary or capricious. The 2015 Implementation Plan was otherwise in conformance with the EPA's Prevention of Significant Deterioration program under the Clean Air Act.

**COUNSEL**

George E. Hays (argued), San Francisco, California; Derf Johnson, Montana Environmental Information Center, Helena, Montana; for Petitioner.

Sheila Baynes (argued) and Jeffrey H. Wood, Acting Assistant Attorney General; Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Kristi M. Smith, Brian Doster, Zach Pilchen, and Melina Williams, Office of General Counsel, Environmental Protection Agency, Washington, D.C.; for Respondents.

Norman J. Mullen (argued), Montana Department of Environmental Quality, Helena, Montana, for Respondent-Intervenor Montana Department of Environmental Quality.

Joshua Frank (argued), Baker Botts LLP, Washington, D.C., for Respondent-Intervenor Talen Montana LLC.

## OPINION

RAWLINSON, Circuit Judge:

Petitioner, Montana Environmental Information Center (Information Center), challenges an action of the United States Environmental Protection Agency (Agency) approving a 1994 revision to Montana's State Implementation Plan (Implementation Plan). Information Center asserts that the Agency's approval was arbitrary and capricious because Montana interprets one of its provisions less stringently than the Clean Air Act would allow. We have jurisdiction to review the EPA's action under 42 U.S.C. § 7607(b)(1), and deny the petition for review.

## I.  Statutory and Regulatory Background

### A.  Clean Air Act

Congress passed the Clean Air Act to protect and enhance the quality of the nation's air. *See* 42 U.S.C. § 7401(b)(1). To achieve this, "the States and the Federal Government partner[ed] in the struggle against air pollution." *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). We have deemed this partnership "a uniquely important system of cooperative federalism in the quest for clean air." *Committee for a Better Arvin v. EPA*, 786 F.3d 1169, 1173 (9th Cir. 2015) (citation omitted).

### B.  Federal-State Partnership

One of the Agency's primary responsibilities under the Clean Air Act is to identify air pollutants that endanger the public health and welfare. *See* 42 U.S.C. § 7408(a). Once

identified, the Agency must then set National Ambient Air Quality Standards (Air Quality Standards), which specify the maximum allowable concentration of those pollutants in the atmosphere. *See id*. § 7409. The Air Quality Standards are subject to periodic review and revision. *See id*. In sum, the federal government's role in the federal-state partnership is to combat air pollution by identifying pollutants and then setting (and updating) Air Quality Standards.

But what of the states? "The [Clean Air Act] requires the states to submit State Implementation Plans, or 'SIPs,' showing how the states will attain [Air Quality Standards] . . . " *El Comite Para el Bienestar de Earlimart v. EPA*, 786 F.3d 688, 692 (9th Cir. 2015) (citing 42 U.S.C. § 7410(a)(1)); *see also Whitman v. Am. Trucking Assn's, Inc*., 531 U.S. 457, 470 (2001) ("It is to the States that the [Clean Air Act] assigns initial and primary responsibility for deciding what emissions reductions will be required from which sources. . . .") (citations omitted). These Implementation Plans must "make demonstrations (of how attainment, maintenance, and progress will be achieved) and [] provide a control strategy that will achieve the necessary reductions and otherwise meet the requirements of the Act." *Hall v. EPA*, 273 F.3d 1146, 1153 (9th Cir. 2001), *as amended* (citation omitted). Each plan must "specify the manner in which [Air Quality Standards] will be achieved and maintained within each air quality control region." 42 U.S.C. § 7407(a).

## C.  State Implementation Plans

If the Agency determines that a proposed Implementation Plan meets the applicable requirements, then that Implementation Plan "bec[o]me[s] *federal* law, not *state* law." *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1097

(9th Cir. 2007), *as amended* (emphasis in the original). That is true in part because Implementation Plans cannot be amended without the EPA's further approval. *See id*.

When the Agency updates its Air Quality Standards, states have three years to revise their Implementation Plans to comply with the new standards. *See* 42 U.S.C. § 7410(a)(1). "These revisions need not be wholesale recastings of [Implementation Plans]; instead, the [Clean Air Act] allows the states to submit, and [the] Agency to review, piecemeal amendments dealing with discrete [Implementation Plan] provisions, leaving most of the plan untouched." *Safe Air*, 488 F.3d at 1092 (citation omitted).

In addition, Implementation Plans must comply with the Clean Air Act's Prevention of Significant Deterioration program (PSD program). *See* 40 C.F.R. § 51.166(a)(1) ("[E]ach applicable State Implementation Plan . . . shall contain emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality."). The purpose of the PSD program is to ensure that major sources of air pollution do not degrade areas that either meet Air Quality Standards (also known as "attainment" areas) or cannot be classified as meeting—or not meeting—Air Quality Standards (also known as "unclassifiable" areas). *See* 42 U.S.C. § 7407(d)(1). The PSD program combats degradation of these areas by requiring developers to acquire permits before constructing new sources of emissions or modifying existing ones. *See* 40 C.F.R. § 51.166(a)(7). The permit requirement applies to existing sources that are planned to undergo a "major modification," *id*., resulting in a "significant emissions increase" and a "significant net emissions increase." *Id*. § 51.166(a)(1)(7)(iv)(a). "Significant emissions increases" are calculated by taking the

"actual emissions" of a source, which establishes a representative baseline level of emissions, *id*. § 51.166(b)(47), and comparing that baseline to the projected emissions, post-modification. *See id*. § 51.166 (a)(7)(iv)(c).

This formula evokes the question of how to determine a source's "actual emissions." The answer has evolved over time. In 1980, the Agency stated that actual emissions

> shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The reviewing authority may allow the use of a different time period upon a determination that it is more representative of normal source operation.

40 C.F.R. § 51.24(b)(21)(1980).

In 1992, the Agency clarified that "a 2-year period which precedes the particular date" has "historically [meant] the 2 years immediately preceding the proposed change to establish the baseline." 57 Fed. Reg. 32,314, 32,323 (July 21, 1992) (citations omitted). Going forward, however, "the [Agency] would presume that any 2 consecutive years within the 5 years prior to the proposed change is representative." *Id.*

Ten years later, the Agency formally updated its definition of "baseline actual emissions." This update involved creating separate definitions for steam power plants and all other stationary sources. As of 2002, the baseline actual emissions of steam power plants equaled the average

rate of a pollutant actually emitted "during any consecutive 24-month period selected by the owner or operator within the 5-year period immediately preceding [the] . . . actual construction of the project. The reviewing authority shall allow the use of a different time period upon a determination that it is more representative of normal source operation." 40 C.F.R. § 51.166(b)(47)(i). The baseline actual emissions of non-steam sources equaled omissions occurring "during any consecutive 24-month period . . . within the 10-year period immediately preceding" construction of a project. *Id*. § 51.166(b)(47)(ii).

Although the Clean Air Act requires each Implementation Plan to contain permitting processes that comply with the PSD program, the Act does not require *verbatim* adoption of the PSD program. Rather, a state is free to deviate so long as it "specifically demonstrates" that those deviations "are more stringent than or at least as stringent in all respects as the corresponding provisions [of the Clean Air Act.]" 40 C.F.R. 51.166(a)(7)(iv).

## II. Factual and Procedural Background

Montana, "like every other state, was first required to submit [an Implementation Plan] to the [Agency] within thirteen months of the Act's . . . passage." *Safe Air*, 488 F.3d at 1093 (citing *Train v. NRDC*, 421 U.S. 60, 65 (1975). In addition, Montana is required to revise its Implementation Plan concomitantly with EPA updates to federal standards. *See* 42 U.S.C. § 7410. Relevant to this case is a revision Montana submitted on March 30, 1994 (1994 Revised Implementation Plan). The revision contained the following definition of "actual emissions:"

>Actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The department may determine that a different time period is more representative of normal source operation. . . .

This definition, in large part, mirrors the Agency's 1980 definition of actual emissions, *see* 40 C.F.R. § 51.24(b)(21) (1980), and was approved by the Agency in 1995. *See* 60 Fed. Reg. 36,715, 36,719 (July 18, 1995).

Between 2008 and 2012, the Agency updated its Air Quality Standards. *See* 81 Fed. Reg. 4225 (Jan. 26, 2016). These updates triggered Montana's obligation to revise its Implementation Plan within three years. *See* 42 U.S.C. § 7410. On December 17, 2015, Montana submitted its final Implementation Plan in response to the 2008–2012 updates. This Implementation Plan contained the same emissions definition that was approved by the Agency in 1995. During the Agency's subsequent notice and comment period, Information Center submitted a comment to the effect that Montana interpreted the definition of "actual emissions" from its 1994 Revised Implementation Plan less stringently than the PSD program requires.

The basis for Information Center's comment was the interpretation of "actual emissions" advanced by the Montana Department of Environmental Quality (DEQ) in unrelated litigation. *See Sierra Club and MEIC v. Talen Montana, LLC*, CV13-32-BLG-DLC-JCL, 2015 WL 13714343 (D. Mont. Dec. 31, 2015). In *Talen*, the DEQ acknowledged that

the Information Center and the Agency read the definition of "actual emissions" to mean "'the' two-year period immediately preceding" a modification.  DEQ argued that "no deference [should be given] to [the Agency's interpretation] because . . . the interpretation that [it is] '*the*' two-year period immediately preceding [a modification] is inconsistent within the rule language which says . . . '*a*' two-year period."  (emphases added).

The Agency responded that it "appreciates and takes seriously [Information Center's comment] that Montana has adopted 'policy interpretations' outside the context of the [Implementation Plan] that may undermine the State's implementation of the [Implementation Plan] as approved by the [Agency]."  Still, the Agency did not find it necessary to "evaluat[e] the merits of these assertions concerning implementation of the [Implementation Plan] in the context of this action" because "this action involves a review of the [Implementation Plan] itself."  Accordingly, the Agency expressed its "inten[t] to evaluate the merits of these assertions, separate from this action, at a future time."  The Agency determined that the previously approved 1994 Revised Implementation Plan and the 2015 Implementation Plan "[met] the relevant structural requirements," and approved the 2015 Implementation Plan.  Information Center timely petitioned this court to review the Agency's action.

## III.  Standard of Review

We review the approval of an Implementation Plan "by considering whether the [Agency's] decision was arbitrary, capricious, an abuse of discretion, or contrary to law." *Committee for a Better Arvin*, 786 F.3d at 1174–75 (citations omitted); *see also Hall*, 273 F.3d at 1155.  Whether the

Agency acted arbitrarily and capriciously "rests on whether it articulated a rational connection between the facts found and the choice made." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003) (citation and internal quotation marks omitted), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004). In conducting this review, we may neither "rubber-stamp administrative decisions" nor "substitute our judgment for that of the agency." *Id.* (citation and alterations omitted).

"With respect to the [Clean Air Act], Congress has given [the Agency] general rulemaking authority, 42 U.S.C. § 7601(a)(1), which, when exercised, requires our deference in accordance with *Chevron*. . . ." *Sierra Club v. EPA*, 671 F.3d 955, 962 (9th Cir. 2012) (citation and internal quotation marks omitted).

## IV.  Analysis

### A. Montana Department of Environmental Quality Statements

The entirety of Information Center's appeal rests on the DEQ's statements in the *Talen* litigation. Information Center argues that Montana's 1994 Revised Implementation Plan did not comply with the Clean Air Act, because the DEQ interprets "actual emissions" less stringently than federal standards would allow. The DEQ's interpretation, Information Center contends, carries the force of law. Information Center maintains that Montana's 1994 Revised Implementation Plan was therefore deficient, and that the Agency should not have approved the 2008–2015 revisions until the state definition of "actual emissions" complied with federal standards.

Information Center relies on *Go v. Holder*, 744 F.3d 604, 611 (9th Cir. 2014), to support its argument that the DEQ's statements have the force of law.  But reliance on *Go* is misplaced in the circumstances of this case.  It is well settled that once the Agency approves either an Implementation Plan or a Revised Implementation Plan, that plan becomes federal law.  *See Committee for a Better Arvin*, 786 F.3d at 1174.  As such, "a state may not unilaterally alter the legal commitments of its [Implementation Plan] once [the Agency] approves the plan."  *Safe Air*, 488 F.3d at 1097 (citation omitted).  Thus, the DEQ's interpretation of "actual emissions" could not invalidate Montana's 1994 Revised Implementation Plan.  And, where the Agency has officially interpreted a vague regulatory term, the Agency's interpretation prevails.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

## B.  Implementation of Program As Opposed to Approval of Plan

The Clean Air Act "permits the [Agency] to issue 'partial approvals' [of Implementation Plans].  *Hall*, 273 F.3d at 1159 (citation and alteration omitted).  In light of this circumstance, the question becomes to what extent the Agency must consider the DEQ's statements as part of the approval process for an Implementation Plan.

"In interpreting [an Implementation Plan], we begin with a look toward the plain meaning of the plan and stop there if the language is clear. . . ."  *Safe Air*, 488 F.3d at 1095.  The language at issue is:

> (1) "Actual emissions as of a particular date
> shall equal . . . a two-year period which

precedes the particular date [of construction,]"
and

(2) "The department may determine that a
different time period is more representative of
normal source operation."

Under Information Center's theory, the DEQ and the Agency
reasonably interpreted "a two-year period" to mean two
different things.    Therefore, the language at issue is
ambiguous.  *See NRDC v. Cnty. of Los Angeles*, 725 F.3d
1194, 1205 (9th Cir. 2013) (explaining that language is
ambiguous "if reasonable people could find its terms
susceptible to more than one interpretation") (citation
omitted).  And while *Safe Air*, 488 F.3d at1095–96, provides
guidance for instances where Implementation Plan language
is *clear*, it does not do so for Implementation Plan language
that is *un*clear.  We do so here:  Where the plain meaning of
an Implementation Plan cannot be readily discerned from the
text, we think it appropriate to give deference to the Agency's
reasonable interpretation.  This approach is consistent with
the deference given under *Chevron* to the Agency's
rulemaking authority, and with how we have reviewed the
Agency's interpretation of Implementation Plan-related
documents.  *See, e.g.*, *El Comite Para el Bienestar de
Earlimart*, 786 F.3d at 696 ("Because the plain language of
the relevant documents is ambiguous, we defer to the EPA's
interpretation if it is reasonable, i.e., if it 'sensibly conforms
to the purpose and wording of the regulations.'") (citation
omitted).

     The Agency's interpretation of the two-year period
immediately preceding the commencement of construction is
consistent with the tenor of the regulation to fix a finite

period for the measurement of baseline emissions. *See* 40 C.F.R. § 51.24(b)(2). In any event, we agree with the Agency that Information Center's comment raises a question of implementation of a program rather than approval of a plan. As such, DEQ's statements in the *Talen* case need not be resolved at the approval phase of the state plan. As explained above, DEQ's policy interpretations do not carry the force of law, contrary to Information Center's contention. *See Committee for a Better Arvin*, 786 F.3d at 1174 ("Once approved by [the Agency, an Implementation Plan] becomes federal law, and cannot be changed unless and until [the Agency] approves any change. . . .") (citation, alterations and internal quotation marks omitted). At this point, we are not even sure if Montana will adhere to its interpretation of the plan language at issue should the occasion arise to implement that language. As matters currently stand, Montana still has the option to change course and adopt the Agency's interpretation that "a 2-year period which precedes the particular date" means "the 2 years immediately preceding the proposed change." 57 Fed. Reg. at 32,323. As a result, we cannot say at this juncture that the Agency acted arbitrarily in approving the 1994 Revised Implementation Plan.

At bottom, we conclude that the Agency's interpretation of the regulation was a reasonable one. *See Auer*, 519 U.S. at 461. The EPA interpreted "a 2-year period which precedes the particular date" to mean "the 2 years immediately preceding" the particular date. 57 Fed. Reg. at 32,323. In *Talen*, Montana argued that this interpretation is irreconcilable with the text because the text employs the indefinite article "a," not the definite article "the." Although the Agency's interpretation does incorporate a definite article, the fact that the language is ambiguous, as discussed, gave the

Agency leeway to pose a reasonable interpretation of the language. *See Comite Para el Bienstar de Earlimart*, 786 F.3d at 696.

Because the Agency's interpretation of ambiguous text in the 1994 Revised Implementation Plan was a permissible one, and because the Agency's interpretation controlled, its approval of the succeeding 2015 Implementation Plan was not arbitrary or capricious. *See Committee for a Better Arvin*, 786 F.3d at 1174–75. The 2015 Implementation Plan was otherwise in conformance with the Agency's PSD program under the Clean Air Act. *See* 40 C.F.R. 51.166(a)(7)(iv) (requiring Implementation Plan compliance with the Agency's PSD program).

## V. Conclusion

The Agency's interpretation of "a 2-year period which precedes the particular date" was a permissible one. 57 Fed. Reg. at 32,323. DEQ's contrary interpretation had no effect on the Agency's approval process. Accordingly, the Agency's approval of Montana's 2015 Implementation Plan was neither arbitrary nor capricious, and Information Center's comment regarding Montana's interpretation of the language in question raised a question of implementation, better addressed at a different time. As the Agency mentioned in its response to Information Center's comment, "there are multiple statutory tools that the [Agency] can use to rectify problems with state implementation of its [Implementation Plan]. For example, the [Clean Air Act] provides the [Agency] the authority to issue [an Implementation Plan] call, 42 U.S.C. § 7410(k)(5); make a finding of failure to implement, *id.* §§ 7410(m), 7509(a)(4); and take measures to

address specific permits pursuant to the [Agency's] case-by-case permitting oversight.  *See, e.g.*, *id*. § 7661d(b)."

**PETITION FOR REVIEW DENIED.**