**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

EL COMITÉ PARA EL BIENESTAR DE
EARLIMART, an unincorporated
association; COMMUNITY &
CHILDREN'S ADVOCATES AGAINST
PESTICIDE POISONING, a California
non-profit corporation WISHTOYO
FOUNDATION, a California non-
profit corporation VENTURA
COASTKEEPER, a California non-
profit corporation ASSOCIATION OF
IRRITATED RESIDENTS, an
unincorporated association,
    *Plaintiffs-Appellees,*

  and

AIR COALITION TEAM,
    *Intervenor,*

  v.

MARY-ANN WARMERDAM,* in her
official capacity as Director
Department of Pesticide
Regulation; LINDA ADAMS, in her
official capacity as Secretary, CA

No. 06-16000

D.C. No.
CV-04-00882-LKK

---

*Mary-Ann Warmerdam is substituted for Paul Heliker, her predecessor as Director of the CA Department of Pesticide Regulation; Linda Adams is substituted for Terry Tamminen, her predecessor as Secretary, CA Environmental Protection Agency; James Goldstene is substituted for Catherine Witherspoon, his predecessor as Executive Officer, CA Air Resources Board; Mary Nichols is substituted for Alan Lloyd, her predecessor as Chair, CA Air Resources Board. *See* Fed. R. App. P. 43(c)(2). The following new members of the California Air Resources Board are substituted for the previous members: Daniel Sperling, Jerry Hill, Doreen D'Adamo, Barbara Riordan, John R. Balmes, Lydia Kennard, Sandra Berg, Ron Roberts, John G. Telles and Ronald O. Loveridge.

11179

Environmental Protection Agency;
JAMES GOLDSTENE, in his official
capacity as Executive Officer, CA
Air Resources Board; MARY
NICHOLS, in her official capacity as
Chair, CA Air Resources Board;
WILLIAM BURKE, in his official
capacity as Member, CA Air
Resources Board; CA JOSEPH
CALHOUN, in his official capacity
as Member, CA Air Resources
Board; DORENE D'ADAMO, in her
official capacity as Member, CA
Air Resources Board; MARK
DESAULNIER, in his official capacity
as Member, CA Air Resources
Board; C. HUGH FRIEDMAN, in his
official capacity as Member, CA
Air Resources Board; MATTHEW
MCKINNON, in his official capacity
as Member, CA Air Resources
Board; BARBARA PATRICK, in her
official capacity as Member, CA
Air Resources Board; BARBARA
RIORDAN, in her official capacity
as Member, CA Air Resources
Board; RON ROBERTS, in his
official capacity as Member, CA
Air Resources Board; ROBERT F.
SAWYER, Chair, CA Air Resources
Board; WILLIAM F. FRIEDMAN, in
his official capacity as Member,
CA Air Resources Board,
                    *Defendants-Appellants.*

EL COMITÉ PARA EL BIENESTAR DE
EARLIMART, an unincorporated
association; COMMUNITY &
CHILDREN'S ADVOCATES AGAINST
PESTICIDE POISONING, a California
non-profit corporation WISHTOYO
FOUNDATION, a California non-
profit corporation VENTURA
COASTKEEPER, a California non-
profit corporation ASSOCIATION OF
IRRITATED RESIDENTS, an
unincorporated association,
                    *Plaintiffs-Appellees,*

AIR COALITION TEAM,
                    *Intervenor-Appellant,*

v.

MARY-ANN WARMERDAM, in her
official capacity as Director
Department of Pesticide
Regulation; LINDA ADAMS, in her
official capacity as Secretary, CA
Environmental Protection Agency;
JAMES GOLDSTENE, in his official
capacity as Executive Officer, Air
Resources Board; MARY NICHOLS,
in her official capacity as Chair,
CA Air Resources Board; WILLIAM
BURKE, in his official capacity as
Member, CA Air Resources
Board; JOSEPH CALHOUN, in his

No. 06-16131

D.C. No.
CV-04-00882-LKK

OPINION

official capacity as Member, CA Air Resources Board; DORENE D'ADAMO, in her official capacity as Member, CA Air Resources Board; MARK DESAULNIER, in his official capacity as Member, CA Air Resources Board; C. HUGH FRIEDMAN, in his official capacity as Member, CA Air Resources Board; MATTHEW MCKINNON, in his official capacity as Member, CA Air Resources Board; BARBARA PATRICK, in her official capacity as Member, CA Air Resources Board; BARBARA RIORDAN, in her official capacity as Member, CA Air Resources Board; RON ROBERTS, in his official capacity as Member, CA Air Resources Board,

*Defendants,*

WILLIAM F. FRIEDMAN, in his official capacity as Member, Air Resources Board,

*Defendant,*

and

ROBERT F. SAWYER, Chair, CA Air Resources Board,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
May 12, 2008—San Francisco, California

Filed August 20, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Edmund G. Brown, Jr., Attorney General of the State of California, James Humes, Chief Deputy Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Senior Assistant Attorney General, John Davidson, Supervising Deputy Attorney General, Michael W. Neville, Deputy Attorney General of California, San Francisco, California, for the defendants-appellants.

Jan L. Kahn and Rissa A. Stuart, Hanford, California, for appellant-intervenors.

Brent Newell and Luke W. Cole, Center for Race, Poverty & the Environment, San Francisco, California, for the plaintiffs-appellees.

**OPINION**

McKEOWN, Circuit Judge:

This case involves a challenge under § 304 of the Clean Air Act ("CAA"), *see* 42 U.S.C. § 7604(a), known as the citizen suit provision. A coalition of community organizations ("El Comité") brought suit against California state officials

("California") responsible for designing and implementing a state air quality plan. The complicated approval process for the State Implementation Plan ("SIP") required much back-and-forth between California and the Environmental Protection Agency ("EPA"). El Comité takes issue with both the process by which California obtained EPA approval of the SIP and the final outcome of that approval process. In particular, El Comité argues that California violated federal law by failing to adhere to the SIP approved by the EPA, which it argues required California to implement additional regulations in five areas where air quality standards for reducing harmful emissions have not been met. California went astray, according to El Comité, by using the wrong data to calculate the baseline for its emission standards and by ignoring deadlines that were intended to be incorporated into EPA's final approval of the SIP. El Comité's claim turns on determination of what documents were incorporated into the final SIP and the EPA rule, and interpretation of what the SIP, and hence federal law, requires of California.

The district court concluded that it did not have jurisdiction to review El Comité's claim regarding the data and methodology used by California to calculate the baseline for emissions standards. The court agreed, however, with El Comité's expansive interpretation of the SIP, and ordered relief based on that interpretation. That relief was also built on the methodology El Comité advocated for use in calculating the baseline — the same methodology the district court had held it was without jurisdiction to review. As it carefully worked through the parties' labyrinthine administrative law arguments, the court acknowledged that its rulings were potentially incongruous. We agree. In our view, the district court ultimately exceeded its jurisdiction. Because § 304 of the CAA provides jurisdiction only to enforce an "emission standard or limitation," and because the challenged conduct did not implicate such a standard or limitation, the court was without jurisdiction to order a remedy.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   THE SIP PROCESS UNDER THE CLEAN AIR ACT

To protect public health and welfare, the CAA requires the EPA to establish National Ambient Air Quality Standards ("NAAQS") for certain air pollutants. 42 U.S.C. § 7409. The Act places much of its enforcement burden on the states, which are required to submit SIPs that show how states will attain the standards for major air pollutants. *Id.* § 7410. Before a SIP becomes effective, the EPA must determine that it meets the CAA's requirements. *Id.* § 7410(k)(3). Once the EPA approves a SIP, it becomes federal law. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 695 (9th Cir. 2004);

Each state is required to designate the areas within its boundaries where the air quality meets the NAAQS ("attainment areas"), and those where the air quality fails to meet the NAAQS ("nonattainment areas") for each pollutant targeted for emissions reductions. 42 U.S.C. § 7407(d)(1)(A). SIPs must include an attainment demonstration, a technical analysis that through air quality modeling demonstrates that the "control measures" proposed by the SIP will ensure that these nonattainment areas attain the NAAQS by the applicable deadline. *Id.* § 7502(c)(1). Plan provisions for nonattainment areas must contain "enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment" by the deadline. *Id.* § 7502(c)(6); *see also Sierra Club v. EPA*, 356 F.3d 296, 299 (D.C. Cir. 2004).

### B.   California's 1994 SIP Process and EPA Review and Approval

Under threat of an EPA takeover of the state's air quality planning, the California Air Resources Board ("CARB"), the state agency responsible for preparing and submitting a SIP for EPA approval, submitted the 1994 SIP. *See* Cal. Health & Safety Code § 39602. The SIP includes a subsection (known as "the Pesticide Element") prepared by the California Department of Pesticide Regulation ("DPR") that proposes strategies for reducing volatile organic compound ("VOC")[1] emissions from agricultural and commercial structural pesticides.

The Pesticide Element set a "goal" of reducing, by 2005, pesticide-related emissions from the 1990 baseline by a "maximum of 20 percent," and provided that "a decision *whether* additional regulatory measures to ensure that reductions in pesticidal VOC emissions are achieved will be made by 1997" (emphasis added). A timeline at the end of the Pesticide Element states that the decision on regulations will be made by November 1997, with the implementation of the plan to occur by December 1998. The plan's summary also states that by December 1998, "[i]mplementation of additional regulatory measures, *if necessary*, will take place to ensure that targeted pesticidal VOC reductions occur" (emphasis added).

After California submitted the Pesticide Element, considerable discussion took place through correspondence between David Howekamp, Director of EPA Region IX Air Division, and DPR Director James Wells. Howekamp expressed concern that the proposed SIP was not complete enough for EPA review. Specifically, EPA was concerned that the SIP lacked specific emission reduction goals specified by date and nonattainment area, and that the SIP did not propose a firm dead-

---

[1]VOCs mix with oxides of nitrogen (NOx) in heat and sunlight to form ground-level ozone, i.e., smog.

line by which California committed to deciding whether to adopt new emissions regulations for several nonattainment areas. To fill these gaps, Howekamp proposed that California "explicitly" commit to a decision deadline of June 15, 1997, and suggested emission reduction goals by nonattainment area.

California capitulated to EPA's requests in a May 11, 1995, letter from James Boyd, then executive officer for CARB, to the EPA, stating that he was "transmit[ting] a clarification" of the Pesticide Element of the 1994 SIP, and noting that the "enclosed letter from DPR clarifies that in the SIP, California has committed to adopt and submit to U.S. EPA by June 15, 1997, any regulations *necessary* to achieve the emission reductions from pesticides specified in the letter." Letter from Boyd to EPA, May 11, 1995 (emphasis added). The enclosed "letter" was a May 9, 1995, memorandum from Wells to Boyd ("the Wells Memorandum"). The Wells Memorandum stated the same commitment referenced in Boyd's cover letter and included a table outlining interim reduction goals for each nonattainment area.

When the EPA issued its Notice of Proposed Rulemaking, the summary of the Proposed Rules identified the Wells Memorandum as a "clarification" of the "technical details of the pesticide commitment" and stated that the "clarification is considered part of California's SIP." Approval and Promulgation of Implementation Plans; California—Ozone, 61 Fed. Reg. 10920, 10935 (March 18, 1996) (to be codified at 40 C.F.R. pt. 52) ("Proposed Rules"). Following the close of the public comment period, but before the Final Rule issued, CARB sent a letter dated June 13, 1996 to Howekamp ("Howekamp letter") seeking to clarify and correct various aspects of the SIP, in particular, to delete the table from the Wells letter labeled "Reductions from 1990 Pesticide Emissions Baselines." This deletion effectively erased any record indicating the *interim* target reductions for the nonattainment areas. Following this modification, the EPA approved the

1994 SIP on January 8, 1997. *See* Approval and Promulgation of Implementation Plans; California—Ozone, 62 Fed. Reg. 1150, 1186-87; 40 C.F.R. § 52.220(c)(204)(i)(A)(6) (1997).

In February, four months before the June 15, 1997, deadline for deciding whether to adopt regulations, a DPR scientist called into question CARB's methodology— "back-casting," or extrapolating backwards from 1991 data— for calculating the 1990 baseline inventory. Back-casting is the methodology stated in the Pesticide Element. The scientist proposed instead calculating the 1990 baseline with 1990 data from the Pesticide Use Report ("PUR"). Although there is no contemporaneous evidence of the decision to switch methodologies, a public workshop package released by DPR in February 1998 confirms that the department adopted the scientist's approach of using the 1990 PUR data.

By the time the June 15 deadline arrived, California had decided it was unnecessary to adopt additional regulations. This decision is documented in a February 1998 letter from Wells in response to a Notice of Intent to Sue under the Clean Air Act sent by the Environmental Defense Center. Wells's letter states that

> [o]ur April 1997 analysis of data through 1995 showed that all nonattainment areas (NAAs) were meeting annual interim goals, and that four out of five were already meeting the final 2005 year goals . . . . Therefore, we determined in April 1997 that no regulations were necessary to reduce VOC emissions by specific percentages. Consequently, no regulations were adopted and submitted to U.S. EPA in June 1997.

## C.  THE CITIZEN SUIT AND DISTRICT COURT ORDERS

El Comité filed a citizen suit under § 304 of the Clean Air Act, 42 U.S.C. § 7604(a), to enforce the 1994 SIP. El Com-

ité's amended complaint includes two claims. The first count alleges that various California agencies "violated an emission standard or limitation by failing to adopt regulations to reduce pesticide-related VOC emissions by June 15, 1997," as required by the Wells Memorandum's clarification of the 1994 SIP. The second count alleges that, in using the 1990 PUR data rather than the 1991 back-cast data, the state violated an emission standard or limitation because it manipulated the 1990 baseline to avoid the obligation to adopt new regulations by June 15, 1997.

The district court issued an order granting El Comité's summary judgment motion on the first count (holding that California failed to adopt regulations in 1997), and granting California's motion on the second count (holding that the court did not have jurisdiction over the claim that California violated the SIP by use of the wrong methodology to calculate the baseline data), and denying the parties' motions in all other respects. *El Comité Para el Bienestar de Earlimart v. Helliker*, 416 F. Supp. 2d 912, 934 (E.D. Cal. 2006). The district court judge, somewhat prescient about the issues before us on appeal, found himself "bemused by the result," but nonetheless stated, "the result, while ironic, is not inconsistent." *Id.* at 916 n.5.

The court issued a second order on remedies ("Remedies Order") providing injunctive and declaratory relief to El Comité. The Remedies Order requires California to "propose, adopt, and submit to EPA for approval and implement regulations no later than January 1, 2008, to achieve the emission reduction goals as set forth in the May 9, 1995, memorandum from James Wells to James Boyd," and to file a status report as to its progress.

The Remedies Order also declared that the defendants "are in violation" of the CAA and the 1994 SIP by "failing to utilize the 1990 PUR data as set forth in the 1994 SIP and by failing to adopt 'enforceable control measures' " as required

by the CAA. In reaching this conclusion, the district court reiterated its earlier conclusion that a SIP must have enforceable standards to be valid, and while the court had not explicitly held that California failed to comply with the SIP by virtue of the failure to adopt and implement regulations, the "record undoubtedly reflects that [California] failed to meet the promises it made in the SIP, including failing to use the correct PUR data." The court reasoned, "[b]y virtue of [the] failure to use the correct PUR data, the [California] defendants consequently were unable to adopt proper 'enforceable control measures,' as they must, under the Clean Air Act." California appealed the summary judgment in favor of El Comité on the first claim and the Remedies Order.

## II.  ANALYSIS

Despite a complicated factual background, the dispute here is not factual, but rather, is a matter of regulatory interpretation and administrative law principles. Our review is *de novo*. *See Arakaki v. Haw.*, 314 F.3d 1091, 1094 (9th Cir. 2002). To determine whether California violated the SIP, and whether the remedies imposed by the district court are appropriate, we first address the scope of the Final SIP. On this issue, the parties hotly contest the significance of the Wells Memorandum, the Howekamp letter, and a declaration by Howekamp prepared for this litigation.[2]

El Comité argues that we cannot consider the revisions to the SIP contained in the Howekamp letter because they were submitted by California to the EPA after the public comment period had closed, and since no other revision rescinded the Wells Memorandum, that memorandum and the Howekamp

---

[2]The two references to Howekamp documents are easily confused. The so-called letter *to* Howekamp was actually authored by CARB on June 13, 1996, but addressed to Howekamp. This document is referred to as "the Howekamp letter." Howekamp also authored the Howekamp declaration as part of this litigation, well after leaving his position at EPA Region IX.

declaration reflect EPA's understanding of California's commitments under the SIP, i.e., its administrative intent in approving the SIP. California argues that the Final SIP excludes the Wells Memorandum, and under principles of administrative law, we are precluded from considering administrative intent because the regulation is unambiguous. California also questions the validity of Howekamp's declaration, which it describes as an "*ex post facto* declaration" by a "private citizen."

Because we conclude that the schedule and interim standards of the Wells Memorandum are not part of the SIP, California would not have been in violation of the SIP even if it had made no decision about the need for further regulations. And significantly, any such decision would have been discretionary by the language of the SIP ("a decision *whether* additional regulatory measures to ensure that reductions in pesticidal VOC emissions are achieved will be made by 1997" (emphasis added)). Nonetheless, El Comité argues that by using the 1990 data rather than the 1991 back-cast data, California violated the SIP by failing to adopt "enforceable control measures." The district court held—and we agree— that the baseline methodology is not "an emission standard or limitation" that falls within the district court's jurisdiction under § 304 of the CAA, 42 U.S.C. § 7604(a). It necessarily follows that the district court also lacked jurisdiction to impose remedies based on the alleged deficiency in the baseline methodology.

## A. THE SCOPE OF THE SIP

The parties frame the key issue as a debate over whether the Wells Memorandum is included in the Final SIP. The heart of El Comité's case is cut out if the memorandum is not part of the Final SIP. On the other hand, if the memorandum, with its detailed interim requirements and fixed date of June 15, 1997, is part of an enforceable SIP, then the case is cast in a very different light. The district court stated that "neither

the statute, the regulatory process, nor the record provide a clear resolution to the problem." We think the issue is not as open-ended as the district court portrays it because the language of the final rule is not ambiguous.

California's arguments on this point are persuasive. It argues that the district court erred in its analysis by ignoring 40 C.F.R. § 52.220, which catalogs revisions to the California SIP but which contains no reference to the Wells Memorandum. *See* 40 C.F.R. § 52.02(f) ("Revisions to applicable plans will be included in this part when approved or promulgated by the Administrator.").[3] In general, "[t]he promulgated provisions, together with any portions of a State plan approved by the Administrator, constitute the applicable plan for purposes of the Act." 40 C.F.R. 52.02(b). Instead, the court relied on two other sources that have little legal traction: (1) certain language in the preamble published in the Notices of Proposed and Final Rulemaking in the Federal Register ("Proposed Rule" and "Final Rule," respectively);[4] and (2) Howekamp's declaration.

---

[3] All documents that EPA incorporates into the SIP under § 52.220 must be filed with the Office of the Federal Register and approved for incorporation by reference by the Director of the Federal Register. *See* 40 C.F.R. § 52.02(d). Such documents must be available at three separate locations: the National Archives and Records Administration; EPA's Office of Air and Radiation Docket Information Center in Washington, D.C.; and the appropriate EPA regional office. Although not definitive, it bears noting that California filed a Freedom of Information Act request for the EPA to produce all documents that "create, clarify, revise or amend" the DPR's obligations under the SIP that were held at any of these locations. EPA's response produced the 1994 Pesticide Element and the 1996 Howekamp letter, but not the Wells Memorandum.

[4] California points out that the operative language in the Federal Register, whereby the EPA exercises its delegated legislative rulemaking authority, is the language that amends the Code of Federal Regulations ("Part 52, chapter I, title 40 of the Code of Federal Regulations is amended as follows"), and that all text prior to this reference is preamble. *See* 62 Fed. Reg. at 1186.

### 1.   The Preamble

**[1]** Regarding the first source, the preamble language should not be considered unless the regulation itself is ambiguous. *See Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002) ("[T]he plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted only when the regulation's language is ambiguous." (citing *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)). The D.C. Circuit took a similar approach in *Wyoming Outdoor Council v. United States Forest Service,* 165 F.3d 43, 53 (D.C. Cir. 1999), explaining that "in the analogous context of statutory construction . . . the language in the preamble of a statute is 'not an operative part of the statute . . . .' " That is, unlike the statute's operative part, the preamble does not "prescribe rights and duties and otherwise declare the legislative will," nor does it "enlarge or confer powers on administrative agencies or officers," but it nevertheless "may aid in achieving a general understanding of the statute." *Id.* (internal quotation marks omitted). By analogy, the "principles governing interpretation of the preamble of a regulation are no different" than those governing statutory interpretation, and thus, "[w]here the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by the language in the preamble." *Id.*

**[2]** El Comité assumes the regulatory language is ambiguous because of the controversy over the Wells Memorandum —that the Proposed Rules referenced the document as a revision, but the Final Rule excluded it among the official revisions approved by EPA. In doing so, El Comité offers a circular argument and glosses over the framework for regulatory interpretation, emphasizing the language of the preamble above all else. And even if the regulations were ambiguous and the preamble properly considered as evidence of context or intent, the preamble to the Final Rule contains a summary

of California's submissions by date of submission that clearly does not include the Wells Memorandum.[5]

El Comité also misapplies the proposition in *Safe Air* that a court interprets a SIP based on its "plain meaning when such a meaning is apparent, not absurd, and *not contradicted by the manifest intent of EPA, as expressed in the promulgating documents available to the public*." 475 F.3d at 1108 (emphasis added). Invoking *Safe Air*, El Comité looks past the plain meaning of the Final Rule, which excludes the Wells Memorandum and any reference to it, and focuses instead on the *proposed* rule's incorporation of the Wells Memorandum as proof of EPA's administrative intent.

[3] El Comité's reliance on the non-final rule ignores the bedrock principle that we look to the plain meaning of the final rule as promulgated. *See Bayview*, 366 F.3d at 698 ("A regulation should be construed to give effect to the natural and plain meaning of its words") (citation omitted).). As part of the rule making process, on June 13, 1996, California wrote to Howekamp at EPA, providing information and cor-

---

[5]The introduction to the summary of the preamble of the Final Rule states:

> EPA is approving revisions to the California State Implementation Plan (SIP) for ozone for 6 nonattainment areas . . . . In addition, EPA is approving specific local and statewide air pollution control measures .. .. The California Air Resources Board (CARB) submitted these SIP revisions to EPA on November 14, 1994, November 15, 1994, December 28, 1994, December 29, 1994, February 7, 1995, March 30, 1995, January 22, 1996, April 4, 1996, May 17, 1996, **June 13, 1996 (Howekamp Letter)**, July 10, 1996, and July 12, 1996.

> EPA is approving these revisions to the California SIP under provisions of the Clean Air Act (CAA) regarding EPA action on SIP submittals for nonattainment areas.

62 Fed. Reg. at 1150. Notably absent from this list of approved SIP revisions is CARB's transmission of the Wells Memorandum on May 11, 1995.

rections to the SIP. The letter requested that EPA excise the interim goals table in the Wells Memorandum. The Final SIP lists the June 1996 letter but does not reference the Wells Memorandum other than in the preamble's summary, and there the table is excised according to the instructions in the Howekamp letter. Thus the Howekamp letter became the final word in the saga of the SIP.

The difficulty with the Howekamp letter, El Comité suggests, is that it was submitted over a month after the public comment period had closed and thus cannot be part of the SIP because EPA's administrative intent to modify the 1994 SIP was not made available for public consideration and comment. *See Safe Air*, 475 F.3d at 1105-06 ("[T]he notice requirements of the APA, [require] that some indication of the regulatory intent that overcomes plain language must be referenced in the published notices that accompanied the rulemaking process. Otherwise, interested parties would not have the meaningful opportunity to comment on proposed regulations that the APA contemplates, because they would have had no way of knowing what was actually proposed" (citations omitted).).

El Comité's focus on administrative intent puts the cart before the horse. We are justified in considering administrative intent only if the regulation is ambiguous, as was arguably the case in *Safe Air*. The difficulty with relying on *Safe Air* in this case is that in *Safe Air* we did not address which documents were and were not part of the SIP—the central issue that concerns us here. Rather, *Safe Air* involved interpretation of a SIP whose contents were already established. It is also significant that *Safe Air* involved a challenge under § 307(b)(1) to the propriety of a rulemaking proceeding, not a challenge to an emission standard under § 304.

**[4]** El Comité's argument takes us in a direction we cannot follow because it implicates a question over which we lack jurisdiction: whether, in revising the SIP along the lines

requested by California and allowing a modification of the SIP *after* the close of the public comment period, the EPA violated the Administrative Procedure Act. *See generally Ober v. EPA*, 84 F.3d 304, 313 (9th Cir. 1996) ("An agency may use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, *so long as no prejudice is shown*" (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995)) (emphasis added).). That question is the quintessential administrative challenge under a petition to review a final decision of the EPA (*see* 42 U.S.C. § 7607(b)(1)), such as was at issue in *Safe Air*, 475 F.3d at 1103. It is one we do not have jurisdiction to decide in *this* appeal, however, because this case was filed under § 304, 42 U.S.C. § 7604(a).

### 2. The Howekamp Declaration

As part of its analysis of intent and whether the Wells Memorandum was incorporated into the final SIP, the district court looked to Howekamp's Declaration. Significantly, this declaration was offered not by an EPA representative but by a former employee some years after the fact. We need not consider the exact scope and admissibility of such intent evidence because, in any event, it cannot override the plain language of the regulation or EPA's contemporaneous statements published in the Federal Register.

[5] In sum, we conclude that the district court erred in holding that the Wells Memorandum was incorporated into the SIP.

### B. THE BACK-CAST METHODOLOGY ESTABLISHING THE BASELINE INVENTORY IS NOT AN EMISSION STANDARD OR LIMITATION

In the district court, El Comité challenged California's use of the 1990 data instead of the 1991 back-cast data. Califor-

nia's use of the improper methodology, El Comité argued, made it impossible for the state to assess whether new regulations were needed, thereby rendering unenforceable the commitment to adopt regulations, if necessary, by June 15, 1997, and making the entire SIP invalid under the CAA. After analyzing the nature of the baseline inventory, the district court granted summary judgment in favor of California: "[El Comité's] second claim fails because a 'baseline inventory' is not an 'emission standard or limitation' subject to challenge under the Clean Air Act." *El Comité*, 416 F. Supp. 2d at 927. The district court found that the baseline inventory is not an emission standard or limitation under the statute because it does not "limit[ ] the quantity, rate, or concentration of emissions of air pollutants on a continuous basis," and does not "relat[e] to the operation or maintenance of a source to assure continuous emission reduction."

Although El Comité did not appeal this issue, its arguments nonetheless implicitly quarrel with this finding. Citing *Bayview*, El Comité attempts to skirt the gap in our jurisdiction by shifting its argument on appeal, claiming that if the SIP is understood to impose an obligation to reduce emissions in nonattainment areas, then the baseline inventory (and by extension, the way it is calculated) are necessary elements of this enforceable commitment. This argument attempts to transform the baseline inventory into an enforceable emission standard or limitation by bootstrapping it to the commitment to decide to adopt regulations, if necessary. While we acknowledge that the baseline is a critical foundation, this does not change our view that neither the baseline nor the methodology qualify as independently enforceable aspects of the SIP. *Bayview* is not to the contrary. *See Bayview*, 366 F.3d at 703 (holding that "Bayview's citizen suit represents an inappropriate attempt to alter [the] explicit provisions" of a SIP). We emphasize this point because it bears on the issue of remedies.

### C. THE DISTRICT COURT LACKED JURISDICTION TO ISSUE A REMEDIES ORDER

**[6]** The district court declared that California violated the CAA and the California SIP by "failing to adopt 'enforceable control measures' as required by the [CAA]." Remedies Order at 2; *see also* Remedies Order at 3 n.2 ("[B]y virtue of their failure to use the correct PUR data, defendants consequently were unable to adopt proper 'enforceable control measures,' as they must, under the Clean Air Act."). Because neither the Wells Memorandum nor the baseline data provide an enforceable emission standard or limitation, no relief is available to El Comité under § 304 of the CAA, 42 U.S.C. § 7604(a). Nor would the district court have jurisdiction to hold, in effect, that the EPA improperly approved an invalid SIP because it lacked enforceable emission standards. That challenge, and any related relief, falls outside the purview of the district court and would have to be brought as a petition to review the EPA's rulemaking process. *See* 42 U.S.C. § 7607(b)(1).

**[7]** We reverse the summary judgment in favor of El Comité, vacate the Remedies Order, and remand with orders to dismiss the case for lack of jurisdiction.

**REVERSED AND REMANDED.**