**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| EL COMITÉ PARA EL BIENESTAR DE EARLIMART, an unincorporated association; ASSOCIATION OF IRRITATED RESIDENTS, a California non-profit corporation; WISHTOYO FOUNDATION, a California non-profit corporation; VENTURA COASTKEEPER, a program of the Wishtoyo Foundation,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY; LISA P. JACKSON, in her official capacity as Administrator of the US EPA; JARED BLUMENFELD, in his official capacity as Regional Administrator for Region IX of the US EPA,<br><br>*Respondents*. | No. 12-74184<br><br><br>OPINION |

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
February 12, 2015—San Francisco California

Filed May 8, 2015

Before: Mary M. Schroeder and Barry G. Silverman, Circuit Judges and Marvin J. Garbis,[*] Senior District Judge.

Opinion by Judge Schroeder

## SUMMARY[**]

### Environmental Law

The panel denied a petition for review brought by several community organizations challenging the Environmental Protection Agency's 2012 approval of revisions and additions to California's Pesticide Element for its State Implementation Plan under the Clean Air Act, relating to the reduction of volatile organic compounds, precursors of ozone, in the San Joaquin and Ventura air basins; and held that the EPA was not arbitrary and capricious in construing the Pesticide Element and approving Fumigant Regulations and the SIP Revision.

The panel held that the EPA's interpretation of the Pesticide Element's commitment to reduce emissions by certain levels was not arbitrary and capricious in light of the ambiguity in the Pesticide Element's plain language.

[*] The Honorable Marvin J. Garbis, Senior United States District Judge for the District of Maryland, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the EPA reasonably determined that the revisions fulfilled the commitment in the original Pesticide Element to adopt enforceable regulations for reducing emissions because the EPA's explanation demonstrated that it considered the relevant data and factors regarding emission levels. The panel also held that the action was not in conflict with the court's decision in *El Comité para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1073 (9th Cir. 2008).

The panel held that the EPA was not unreasonable in finding that California's assurances of compliance with federal and state law pursuant to § 110(a)(2)(E) of the Clean Air Act were adequate in light of an earlier Title VI civil rights complaint filed with the EPA concerning volatile organic compounds emissions in the San Joaquin Valley.

## COUNSEL

Brent J. Newell (argued), Sofia Parino, Center on Race, Poverty & the Environment, San Francisco, California, for Petitioners.

Robert G. Dreher, Acting Assistant Attorney General, Dustin J. Maghamfar (argued), Environmental Defense Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Jefferson Wehling, Office of Regional Counsel, Jan Tierney, Office of General Counsel, United States Environmental Protection Agency, Washington, D.C., for Respondents.

Rissa A. Stuart, Ann M. Grottveit, Katherine E. Underwood, Kahn, Soares & Conway, LLP, Sacramento, California, for Amicus Curiae Air Coalition Team.

## OPINION

SCHROEDER, Senior Circuit Judge:

We deal with another phase of California's efforts to create a "Pesticide Element" for its State Implementation Plan ("SIP") that meets the requirements of the Clean Air Act, 42 U.S.C. § 7401 *et seq*. This is a challenge by several community organizations to the Environmental Protection Agency's ("EPA") 2012 approval of revisions and additions to California's Pesticide Element relating to the reduction of volatile organic compounds ("VOCs"), precursors of ozone, in the San Joaquin and Ventura air basins.

In an earlier decision involving the Pesticide Element, we held that certain of its commitments were not enforceable emissions standards or limitations of the SIP that could be challenged pursuant to § 304(a) of the Clean Air Act. *El Comité para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1073 (9th Cir. 2008). The EPA subsequently approved revisions to California's Pesticide Element, so this is a suit pursuant to § 307(b) of the Clean Air Act, which provides for review of agency action in approving a SIP.

There are three issues presented. The first is whether the EPA was arbitrary and capricious in its interpretation of the Pesticide Element's commitment to reduce emissions by certain levels. We hold that the EPA's interpretation was

reasonable in light of the ambiguity in the Pesticide Element's plain language.

The second issue is whether the EPA reasonably determined that the revisions fulfilled the commitment in the original Pesticide Element to adopt enforceable regulations for reducing emissions. We hold that the determination was reasonable, because the EPA's explanation demonstrates that it considered the relevant data and factors regarding emission levels. Further, the action was not in conflict with our decision in *Warmerdam*. Because the revisions fulfilled California's original commitment, the EPA correctly determined that it did not need to consider whether the original commitment itself was enforceable.

The third issue is whether the EPA was unreasonable in finding that California's assurances of compliance with federal and state law pursuant to § 110(a)(2)(E) of the Act were adequate in light of an earlier Title VI civil rights complaint filed with the EPA concerning VOC emissions in the San Joaquin Valley. We hold that the EPA's determination was not unreasonable because it provided a reasoned explanation for its actions which took into account the EPA complaint, as well as the EPA's own investigation, and evidence of California's subsequent compliance with a settlement order.

We therefore deny the petition for review, with the hope that our action will bring to an end litigation and administrative proceedings over the Pesticide Element dating back to 1994.

## BACKGROUND

### I.  Statutory Background

The Clean Air Act ("CAA" or "Act") directs the EPA to establish national ambient air quality standards ("NAAQS") for pollutants that endanger public health or welfare. 42 U.S.C. § 7409.  The CAA requires the states to submit State Implementation Plans, or "SIPs," showing how the states will attain the NAAQS for the major air pollutants.  *Id.* § 7410(a)(1).  The EPA is tasked with determining whether a SIP complies with the Act's requirements. *Id.* § 7410(k)(3). Once approved by the EPA, a SIP has the "force and effect of federal law."  *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007).

A state must designate the areas within its boundaries as either "attainment" or "nonattainment" depending on whether they meet the NAAQS for a given pollutant.  *See* 42 U.S.C. § 7407(d)(1)(A).  SIPs covering nonattainment areas must provide "enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment" by the applicable deadline. *Id.* § 7502(c)(6). The state is further required to provide "necessary assurances" that no state or federal law would impede implementation of the SIP or parts thereof.  *Id.* § 7410(a)(2)(E).

These SIPs also must include an attainment demonstration, to show through air quality modeling that the SIP's proposed control measures will ensure the areas timely attain the ozone standard, *id.* § 7502(c)(1), and a reasonable

further progress demonstration, to show that the SIP will reduce pollutant emissions by a specified percentage each year until the attainment year. *Id.* § 7511a. States must submit to the EPA for approval any proposed revisions to a SIP. The Act's "anti-backsliding" provision mandates that the EPA "shall not approve a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirement of this chapter." *Id.* § 7410(*l*).

Approved SIPs are enforceable by citizens in federal court under § 304(a) of the Act. *Id.* § 7604(a). Citizens' suits are limited to enforcing a SIP's specific strategies, however, and may not enforce its overall objectives or aspirational goals. *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 701 (9th Cir. 2004). Under § 307(b)(1), 42 U.S.C. § 7607(b)(1), citizens may also petition for review of the EPA's rulemaking process. That is the jurisdictional provision invoked in this case. Unlike the citizen suit provision of § 304, which authorizes only actions to review enforceable emission standards or limitations, *see Warmerdam*, 539 F.3d at 1073, the provisions of § 307 allow petitions for review of final EPA actions in approving an implementation plan. *Compare id.* § 7604(a), *with* § 7607(b)(1).

## II. Prior Proceedings

One of the air pollutants the CAA regulates is ozone, which forms as a result of photochemical reactions between volatile organic compounds ("VOCs") and oxides of nitrogen ("NOx") in the atmosphere. 69 Fed. Reg. 23,858 (Apr. 30, 2004). As part of its 1994 SIP for attaining the ozone

NAAQS, California included a subsection known as the "Pesticide Element," which proposed strategies for reducing VOC emissions from agricultural and commercial pesticide use in five nonattainment areas.

As submitted, the Pesticide Element contained two primary commitments. First, California committed "to reduce volatile organic compound (VOC) emissions from agricultural and commercial structural pesticide applications by a maximum of 20 percent from the 1990 baseline emission inventory to the year 2005." The 1990 baseline was to be established using 1991 VOC pesticide emission data, adjusted to represent the 1990 base year. Second, California committed that its Department of Pesticide Regulation ("DPR") would decide whether to adopt "additional regulatory measures to ensure that reductions in pesticidal VOC emissions are achieved" by 1997.

Several years of back and forth communication between the EPA and California's DPR ensued as the EPA sought to satisfy itself that the Pesticide Element met the Act's requirements for approval. Specifically, the EPA asked California to confirm that it committed to specific percentage reductions on a linear basis from 1996 through 2005 in each nonattainment area. It also requested that California specify a more precise deadline for deciding whether additional regulations were necessary to achieve those reductions.

California complied with these requests via correspondence from state officials. In a May 1995 letter known as the "Wells Memo," the State said that it "committed to adopt and submit to U.S. EPA by June 15, 1997, any regulations necessary to achieve the emissions reductions from pesticides . . . ." The State further said in the

Wells Memo that it would achieve the following percentage reductions in emissions, in the specific years for each area:

| Reductions From 1990 Baseline | | | | |
|---|---|---|---|---|
| Ozone Nonattainment Area | 1996 | 1999 | 2002 | 2005 |
| Sacramento Metro | 8% | 12% | 16% | 20% |
| San Joaquin Valley | 8% | 12% | 16% | 20% |
| South Coast | 8% | 12% | 16% | 20% |
| Southeast Desert | 8% | 12% | 16% | 20% |
| Ventura | 8% | 12% | 16% | 20% |

The EPA, in its proposed rulemaking, included the Wells Memo as part of the Pesticide Element. Before the Pesticide Element was formally approved, however, California submitted corrections to the proposed rule. In a June 1996 letter known as the "Howekamp Letter," California asked the EPA to delete the Wells Memo's table showing interim year reductions in each area, stating that its "commitment is for a 20% reduction from 1990 levels by 2005 in each SIP area . . . ." But the Howekamp Letter also stated that, for purposes of the attainment and reasonable further progress demonstrations required under the Act, the State "only took credit" for the following reductions in each area's attainment year:

"SJV 1999 = 12%
Sac 2005 = 20%

Ven 2005 = 20%
SED 2007 = 20%
SC 2010 = 20%."

The Howekamp Letter thus included references to both a 20% and a 12% reduction in VOC emissions for the San Joaquin Valley. On January 8, 1997, the EPA approved the Pesticide Element, incorporating the Howekamp Letter by reference (collectively the "1994 Pesticide Element").

When the June 15, 1997 deadline arrived, California had decided that no further regulations were necessary to ensure emissions reductions under the Pesticide Element, so it had adopted none. A coalition of community organizations led by El Comité para el Bienestar de Earlimart, also a petitioner here, then filed a citizens suit under § 304(a) of the Act to enforce the 1994 Pesticide Element. *See El Comité para el Bienestar de Earlimart v. Helliker*, 416 F. Supp. 2d 912 (E.D. Cal. 2006). El Comité argued that California violated the Pesticide Element's enforceable emissions standards and limitations, (1), by failing to adopt by June 15, 1997, regulations necessary to ensure the interim and final VOC emission reduction goals provided in the Wells Memo; and (2), by using data other than the 1991 data specified in the Pesticide Element to calculate the 1990 baseline inventory, thereby manipulating the standard for measuring emissions to avoid its obligation to adopt regulations. *Id.* at 916.

The district court partially granted El Comité's motion for summary judgment, holding that California had failed to carry out its commitment in the Wells Memo to adopt regulations by June 15, 1997. *Id.* at 933–35. It denied the remainder of the motion, holding that the plaintiffs could not challenge the baseline inventory as an enforceable emission

standard or limitation because it did not, on its own, "limit[] the quantity, rate, or concentration of emissions of air pollutants on a continuous basis."  *Id.* at 928 (quoting 42 U.S.C. § 7602(k)).

On appeal, our court reversed the district court in part.  *El Comité para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1069 (9th Cir. 2008).  We concluded that there was no enforceable commitment to adopt regulations in the Pesticide Element because the SIP did not include the Wells Memo. *Id.* at 1069–72.  California therefore could not be in violation of the SIP, because, without the Wells Memo, the Pesticide Element provided only a discretionary commitment to decide "whether" to adopt additional regulations by 1997. *Id.* at 1069.

We agreed with the district court that the baseline inventory was not itself an emissions standard or limitation that could be enforced. *Id.* at 1072–73.  Because neither the Wells Memo nor the baseline inventory provided an enforceable emission standard or limitation, we concluded that the district court lacked jurisdiction to review the claims under § 304(a) of the Act. *Id.* at 1073.

After the *Warmerdam* decision established that the Wells Memo was not a part of the Pesticide Element, El Comité filed a petition for review in this court to challenge the EPA's 1994 approval of the Pesticide Element on the ground it did not contain any enforceable commitments. *El Comité para el Bienestar de Earlimart v. EPA*, No. 08-74340 (9th Cir.) ("*El Comité I*").  In light of a remand order in a related case, *see Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 678 (9th Cir. 2011), we remanded the petition to the EPA for it to determine whether the "Pesticide Element has sufficiently

enforceable commitments to meet the Act's requirements." *El Comité I*, No. 08-74340 (July 2, 2012 order).   In the meantime, however, California had been busy revising the Pesticide Element as it pertained to Ventura and the San Joaquin Valley.

In 2009, California submitted new SIP regulations and revisions to the EPA for approval.  The proposed "Fumigant Regulations" limited allowable fumigant pesticide application methods and use, established recordkeeping and reporting requirements for all five nonattainment areas, and imposed a fumigant cap in Ventura.   Along with the Fumigant Regulations, California submitted the Pesticide Emission Reduction Commitment for the San Joaquin Valley (the "SIP Revision").  The SIP Revision established a fixed limit of 18.1 tons per day ("tpd") for fumigant emissions in the San Joaquin Valley, and also provided a specific methodology to establish the 1990 pesticide VOC emissions baseline level and to evaluate compliance with the Pesticide Element.

In November 2012, the EPA approved the Fumigant Regulations and the SIP Revision, and it responded to the remand order in *El Comité I*.  It determined that the Fumigant Regulations, together with the SIP Revision, fulfilled the Pesticide Element's commitment to adopt enforceable regulations to ensure the required emissions reductions. Thus, the EPA concluded that there was no need to revisit its approval of the original Pesticide Element to determine if the earlier commitment to adopt regulations was enforceable.  It is the November 2012 final action that the petitioners now challenge.

### III.    This Petition for Review

El Comité filed this petition under § 307(b)(1) of the Act, 42 U.S.C. § 7607(b)(1), seeking review of the EPA's final action approving the Fumigant Regulations and SIP Revision. It advances three arguments.  First, El Comité contends that the Pesticide Element committed California to a 20% reduction in emissions from 1990 levels in the San Joaquin Valley, not a 12% reduction as the EPA interpreted the documents, and thus the EPA should have considered whether its approval of the Fumigant Regulations and SIP Revision violated the Act's anti-backsliding provision. Second, it argues that the Fumigant Regulations and SIP Revision do not fulfill the Pesticide Element's original commitment and thus the EPA unreasonably failed to consider whether the Pesticide Element was enforceable per the remand order.  Lastly, El Comité contends the EPA failed to secure necessary assurances from California that its proposed rules would not violate Title VI of the Civil Rights Act by exposing Latino schoolchildren to a disparate impact from pesticide use.

This dispute requires us to consider, in the specific circumstances surrounding the various permutations of California's Pesticide Element, whether the EPA's actions were arbitrary and capricious.  *See Sierra Club v. EPA*, 671 F.3d 955, 961 (9th Cir. 2012).  We conclude that on these facts, the EPA was not arbitrary and capricious in construing the Pesticide Element and approving the Fumigant Regulations and SIP Revision.

**ANALYSIS**

## I. The EPA Reasonably Construed the Pesticide Element's Ambiguous Language as Committing to a 12% Reduction in Emissions for the San Joaquin Valley by 1999

Section 110(*l*) of the Act, the so-called anti-backsliding provision, states that the EPA "shall not approve a revision of a [SIP] if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . or any other applicable requirements of this chapter." 42 U.S.C. § 7410(*l*). When approving the SIP Revision, the EPA found that the Pesticide Element committed to a 12% reduction in emissions from 1990 levels for the San Joaquin Valley by 1999. It therefore concluded that the SIP Revision's 18.1 tpd emissions cap, which corresponds to a 12% reduction from 1990 levels, did not weaken the existing commitment in violation of § 110(*l*).

El Comité contends that the plain language of the Pesticide Element requires a 20% reduction in emissions from 1990 levels in the San Joaquin Valley, not a 12% reduction. Thus, it argues that the EPA failed to consider whether the SIP Revision's 18.1 tpd emissions cap would weaken the existing SIP in violation of § 110(*l*).

The difficulty with this argument is that the Pesticide Element's commitment to reduce VOC emissions in the San Joaquin Valley is ambiguous, because it refers to both a 12% reduction and a 20% reduction. As approved, the Pesticide Element includes both the Element itself and the Howekamp Letter, which is incorporated by reference. The Pesticide Element itself does not refer to the 20% emissions reduction

as a "commitment," but only as a "goal" or "target." The Howekamp Letter, however, explicitly states that the "commitment is for a 20% reduction from 1990 levels by 2005 in each SIP area . . . ." But the Howekamp Letter then goes on to say that California is taking credit only for a 12% reduction for the San Joaquin Valley in its 1999 attainment year, and that the table from the Wells Memo showing a 20% reduction by 2005 in that area is deleted. Additionally, the spreadsheets attached to the Howekamp Letter, which it says "identify the reductions that the State committed to achieve," show a 12% reduction in VOC emissions in 1999 for the San Joaquin Valley. The Howekamp Letter thus creates ambiguity because it is internally contradictory, referencing both a 12% and 20% reduction commitment. Further, its reference to a 20% commitment is inconsistent with the Pesticide Element's description of 20% as a "goal."

Because the plain language of the relevant documents is ambiguous, we defer to the EPA's interpretation if it is reasonable, i.e., if it "sensibly conforms to the purpose and wording of the regulations." *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999) (internal quotation marks and citation omitted); *see also Safe Air*, 488 F.3d at 1095–96.

After considering the Pesticide Element in its entirety, the EPA concluded that it committed the State to a 12% reduction in VOC emissions from 1990 levels in the San Joaquin Valley by 1999, and that the 20% figure was not a commitment but an aspirational goal. This interpretation is supported by the Pesticide Element's language, which repeatedly refers to the 20% reduction as a "goal" and "target," and reserves flexibility to adjust that goal. While the Howekamp Letter does at one point state that the "commitment is for a 20%

reduction," giving that language controlling effect would require us to ignore both the reference to a 12% commitment and the description of the 20% figure as a "goal." "[O]ur task is to interpret the regulation as a whole, . . . not to give force to one phrase in isolation." *Bayview*, 366 F.3d at 701 (quoting *Campesinos Unidos, Inc. v. U.S. Dep't of Labor*, 803 F.2d 1063, 1069 (9th Cir. 1986)).

The EPA's interpretation is also consistent with the Pesticide Element's purpose within the larger regulatory scheme. The Pesticide Element, as a part of California's SIP, was designed to attain the ozone standards set by the Act. To attain the ozone NAAQS by its 1999 deadline, the San Joaquin Valley had to reduce VOC emissions at least 12% from 1990 levels. We interpret the SIP "in light of the overall statutory and regulatory scheme." *Bayview*, 366 F.3d at 701 (quoting *Campesinos Unidos*, 803 F.2d at 1069). It therefore makes sense to interpret the 12% reduction necessary to achieve attainment as the Pesticide Element's firm commitment, with the more optimistic 20% reduction as an aspirational goal. *See Bayview*, 366 F.3d at 702 (applying similar reasoning to reject argument that a SIP measure, which "was *not* a mandated condition precedent to NAAQS attainment," was an enforceable commitment).

El Comité points out that in the Howekamp Letter, California said it was taking credit for a 12% reduction, and argues that "taking credit" for a reduction and committing to a reduction are two different things. Under the Act, California's SIP had to include an attainment demonstration and reasonable further progress demonstration for the San Joaquin Valley as an ozone nonattainment area. *See* 42 U.S.C. §§ 7502(c)(1), 7511a. El Comité thus contends that the Howekamp Letter's statement about "taking credit"

for a 12% reduction in 1999 merely clarified that for purposes of those required demonstrations, California was not using the 20% figure; instead, it was using the reduction percentage each area was projected to achieve in its attainment year. Because the San Joaquin Valley was the only area covered by the Pesticide Element with an attainment year prior to 2005, El Comité argues that the letter was being careful to take credit only for a partial 12% reduction in the Valley's attainment demonstrations for 1999, not creating a different commitment.

El Comité's interpretation may be plausible, but it requires us to read into the Howekamp Letter more than it states. In light of the Pesticide Element's ambiguous language we must, in any event, give deference to the EPA's interpretation so long as it is reasonable. *See Crown Pacific*, 197 F.3d at 1038. The EPA's interpretation is supported by the language of the Pesticide Element and the documents incorporated therein, and it also is consistent with the California SIP's overall regulatory purpose. We hold that the EPA did not arbitrarily and capriciously fail to consider whether the SIP Revision violated § 110(*l*) of the Act, because it reasonably interpreted the Pesticide Element as committing to a 12% reduction in VOC emissions from 1990 levels by 1999 in the San Joaquin Valley.

## II. The EPA's Determination That the Fumigant Regulations and SIP Revision Satisfied the Pesticide Element's Commitment to Adopt Enforceable Regulations Was Not Arbitrary and Capricious

The Pesticide Element committed California's DPR to decide by 1997 whether to adopt additional regulations to ensure pesticide VOC emissions reductions of 12% in the San

Joaquin Valley and 20% in Ventura would be met.  The remand order in *El Comité I* instructed the EPA to consider whether this commitment was enforceable.   The EPA concluded, however, that the question of enforceability was irrelevant, since its intervening approval of the Fumigant Regulations and SIP Revision fulfilled the Pesticide Element's commitment to adopt regulations ensuring the requisite emissions reductions.

El Comité challenges the EPA's conclusion that the Fumigant Regulations and SIP Revision fulfilled the Pesticide Element's commitment, for two reasons.  First, El Comité claims that the Fumigant Regulations do not ensure that the 12% and 20% reductions will be met, because (a) they may not assure compliance in years of high fumigant emissions; and (b) they do not regulate non-fumigant VOC emissions, which also vary from year to year.  Second, it argues that the SIP Revision, which provides an 18.1 tpd emission cap in the San Joaquin Valley and commits to adopt regulations on non-fumigant VOC emissions by 2014, is unenforceable and therefore cannot help fulfill the Pesticide Element's commitment.  These arguments are unavailing.

### A.  The EPA reasonably concluded that the Fumigant Regulations are sufficient to meet the emissions reductions required by the Pesticide Element.

We will set aside the EPA's action only if it is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42 (1983).  While our review under this standard is narrow, the EPA is required to "examine the relevant data and provide a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Id.* at 43

(quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  If the explanation reveals that the EPA's decision was based on a consideration of the relevant factors and there has been no clear error of judgment, we will not substitute our judgment for that of the EPA.  *Id.*

The EPA has met its burden here.  The EPA reasonably concluded that the Fumigant Regulations were sufficient to keep pesticide VOC emissions below required levels in typical years based on projected emissions data.  The EPA did not overlook the fact that fumigant emissions vary from year to year and thus fail to consider a critical part of the problem, as El Comité claims it did.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (noting agency action may be arbitrary and capricious if it overlooks an important aspect of the problem).  The EPA discussed variation in fumigant emissions, explaining that even with variations, the data reflected no violations of emissions limits in the years since the regulations had been implemented in California.  Thus, the EPA had a reasonable basis for concluding year-to-year variations in fumigant emissions were unlikely to interfere with the required emissions reductions.

Nor is it critical that the Fumigant Regulations do not regulate non-fumigant VOC emissions, even though such emissions account for over 75% of total VOC emissions in the San Joaquin Valley, and approximately 10% of total emissions in Ventura.  The Pesticide Element did not require that all sources of VOC emissions be regulated; it merely required that total emissions be reduced by 12% or 20% from 1990 levels.  The EPA reasonably determined that the Fumigant Regulations alone were sufficient to comply with the emissions limits.  It acknowledged, however, that in years of historically high non-fumigant emissions, the limit might

be exceeded in the San Joaquin Valley. But it also concluded that California's commitment in the SIP Revision to adopt non-fumigant regulations by 2014 sufficiently addressed this possibility. The EPA's determination that the rules were sufficient to ensure the reductions was rational and related to the facts, *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and therefore was not arbitrary and capricious.

### B. The EPA reasonably determined that the SIP Revision is enforceable.

SIPs must contain enforceable emissions limitations and control measures for attaining the NAAQS to receive EPA approval under the Act. *See* 42 U.S.C. § 7410(a)(2). El Comité argues the EPA erred by finding the SIP Revision enforceable.

The SIP Revision establishes a fixed limit of 18.1 tpd of fumigant emissions in the San Joaquin Valley, and provides a methodology for establishing the 1990 emissions level baseline to evaluate compliance with the Pesticide Element. El Comité contends that the EPA violated our holding in *El Comité para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062 (9th Cir. 2008), by concluding that the inventory methodology rendered the 18.1 tpd emissions cap enforceable. Since the emissions cap is equivalent to a 12% reduction in emissions from 1990 levels, El Comité argues that the SIP Revision changed the form, but not the substance, of the Pesticide Element's original unenforceable commitment.

In *Warmerdam*, we held that a baseline inventory used to calculate emissions levels was not itself an enforceable emission standard or limitation for purposes of citizen suits

under § 304. *Id.* at 1072–73. In *Warmerdam*, however, the baseline inventory was not tied to any emissions limit or control measures, because this court found that the Wells Memo had not been incorporated into the SIP. *See id.* at 1069–72. In the absence of the Wells Memo's commitment to determine whether regulations were necessary to achieve specified emissions reductions, the inventory methodology did not, on its own, "limit[] the quantity, rate, or concentration of emissions of air pollutants on a continuous basis." *See id.* at 1072–73 (quoting 42 U.S.C. § 7602(k)). In this case, the inventory methodology is tied to enforceable emissions controls: the SIP Revision's 18.1 tpd emissions cap and the Fumigant Regulations. The EPA explained in the final rule that it was interpreting these revisions collectively, stating "[w]e cannot consider the 18.1 tpd emission limit for the [San Joaquin Valley] as unrelated to the fumigant regulations." Thus, contrary to El Comité's claims, the EPA did not find the SIP Revision enforceable merely because it included a method for calculating the inventory to evaluate compliance. The EPA approved the SIP Revision emissions cap and methodology for calculating inventory *along with* the Fumigant Regulations' control measures.

El Comité incorrectly asks us to consider the enforceability of each individual component of the overall scheme to regulate pesticide VOC emissions. Although the Act does require a SIP to include enforceable control measures, El Comité points to nothing in the Act that requires each individual component of a SIP to be independently enforceable. *See* 76 Fed. Reg. 26,609-01, 26,612 (May 9, 2011) ("SIPs contain many aspects which are not federally enforceable emissions limitations. For example, approved SIPs contain such items as current emissions inventories, future emissions inventory projections based upon economic

and technological trends, and air quality modeling."). *Warmerdam* does not indicate otherwise, because it dealt with a baseline inventory uncoupled from any emissions limitation or control measure. *See* 539 F.3d at 1072–73.

Thus, it was reasonable for the EPA to conclude that the Fumigant Regulations, together with the SIP Revision, fulfilled the Pesticide Element's commitment to adopt regulations ensuring emissions levels were reduced by 12% and 20% from 1990 levels in the San Joaquin Valley and Ventura, respectively. It therefore was not arbitrary and capricious for the EPA to decline to consider whether the Pesticide Element's original commitment was enforceable under the remand order, because the newly approved rules fulfilled that commitment regardless.

## III.   The EPA Did Not Arbitrarily and Capriciously Determine That California Provided Necessary Assurances

To meet the Act's requirements for SIP approval, a state must provide the EPA with "necessary assurances" that no federal or state law prohibits the state from carrying out the SIP or a portion thereof. 42 U.S.C. § 7410(a)(2)(E). In its final rule approving the Fumigant Regulations and SIP Revision, the EPA concluded that California provided such assurances. El Comité argues the EPA's determination was arbitrary and capricious because the EPA failed adequately to consider evidence El Comité submitted during the comment period.

During the comment period on the proposed rules, El Comité submitted evidence that it claimed showed a potential violation of Title VI of the Civil Rights Act, 42 U.S.C.

§ 2000d *et seq.*  Its claim rested on the EPA's finding of a Title VI violation in connection with an earlier administrative complaint, referred to as the *"Angelita C*." complaint.  That complaint was filed with the EPA's Office of Civil Rights in 1999, when Latino parents and schoolchildren alleged that schools with high percentages of Latino children were disparately affected by DPR's renewal of the registration for fumigant pesticide methyl bromide.  In response, the EPA undertook a study of the effects of methyl bromide use from 1995 to 2001, applying an "exposure assessment and disparity analysis."  The EPA concluded that its analysis supported a preliminary finding of a prima facie Title VI violation, and the EPA and DPR entered into a settlement agreement in 2011.

To support its claim of a potential violation, El Comité submitted the EPA's analysis and findings in *Angelita C.* and a copy of the 2011 settlement agreement, along with evidence purportedly demonstrating that pesticide use had not gone down since the EPA completed it's study in 2001.  The EPA required California to respond.

In response, California submitted proof of its compliance with the *Angelita C.* settlement, as well as reports indicating the new rules would actually reduce overall pesticide emissions and have no negative environmental impact.  The EPA determined that California satisfied its burden to provide assurances of compliance with federal law.

El Comité now argues the EPA should have done more. According to El Comité, the EPA should have undertaken a study like the one it conducted in response to the 1999 complaint.  El Comité effectively contends the EPA should have evaluated California's assurances the same way the EPA

would have to deal with a pending Title VI complaint setting forth allegations of a current violation.

El Comité's argument fails because it misconstrues the EPA's burden regarding the "necessary assurances" requirement. The EPA has a duty to provide a reasoned judgment as to whether the state has provided "necessary assurances," but what assurances are "necessary" is left to the EPA's discretion. *NRDC*, *Project on Clean Air v. EPA*, 478 F.2d 875, 890–91 (1st Cir. 1973); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (providing that an agency's decision is not arbitrary and capricious if it considered the relevant data and gave a satisfactory explanation for its action).

The EPA obtained a response from California that provided assurances of the state's compliance with the settlement agreement, and also provided reports on the effect of the new rules. El Comité provided no proof of a current or ongoing violation. It merely provided evidence of the earlier violation, and pointed to continued pesticide use since that time. The EPA explained that this evidence failed to draw any connection between the proposed rules and a potential disparate impact. The EPA fulfilled its duty to provide a reasoned judgment because its determination was cogently explained and supported by the record.

## CONCLUSION

The Petition for Review is **DENIED**.